Southwest Bank v. De Nitro's, Louis v. Poulokefalos Please step up and identify yourselves for the record. Both sides. Good morning, Your Honor. My name is Richard Jones. I represent Southwest Bank of St. Louis. What's your name again? Richard Jones. Good morning, Your Honors. Robert Wagner on behalf of the defendants, property owners. All right, gentlemen. We have a busy schedule today, so we're going to limit you to 15 minutes per side. Save your time for rebuttal if you choose to do so. May it please the Court. It may. I represent Southwest Bank of St. Louis, which is a lender and has a security interest in a certain collateral, which is located at an industrial building at 1975 Cornell in Melrose Park, Illinois. This industrial building is owned by the defendants, Apolles, De Nitro's, Poulokefalos, and Nicholas Kalouras. The owners of the building purchased the building in 1966, and it had various uses from 1966 until 2003 when a tenant by the name of Converters Extruded Films, Inc. entered into a lease for a film extruding business. This business involves a process of taking raw materials and converting them into a film type of material that's used to create a final process, which is used for film. It's basically a raw item, but it converts basic raw materials into a sheet that they cut into film material. The business of Converters Extruded Films required the use of certain specific type of equipment, and that equipment was brought into the building piece by piece. There were silos. There were converter machines. There were extruders, and they were all pieced together and welded together into a large process, which was then subsequently bolted to the floor of this building. Converters Extruded Films assigned the lease to C. Extruded Films, LLC, which is my client's borrower in the year 2005. At that time, my client made a loan in the amount of $1 million to its borrower, C. Extruded Films, for the purpose of purchasing this business. Now, I just want to spend a little bit of time talking about the business so that you understand how this equipment fits into the context of the business. Raw materials would be delivered by truck to the building, and there was a pipe outside of the building. That pipe would funnel the raw materials into silos that were inside the building. There were four silos inside the building, and they would store the raw materials in the silos. They would use this air compression system to heat the raw materials and then bring them through these extruders up to a tower, which was about a story and a half high, and then they would come down conveyor belts to the bottom where they would be cut. They would then be brought to a winder, which would take these large bats of film and wind them into bats, and then they would take them to a stretch wrap machine, which would actually envelop them in a plastic type of material so that they could be used as an end product to be sent to whoever was going to be using this film. So this process involved a number of different machines. It involved a stretch wrapper, which was a freestanding machine. It involved an ARIMA recycling machine, which they used to take the miscellaneous materials that were cut from the bats of film. They would throw this into a recycling machine, and then it would end up back in the silos for use later. Counsel, this is all very interesting, because isn't the issue here whether all of these fixtures, whether they're fixtures or trade fixtures, could be removed without causing damage to the premises? Isn't that the issue? I think you've got to move on. Thank you. The testimony at trial by the owner was that all of these pieces of equipment were brought into the building piece by piece. No walls were removed. Each piece of equipment was brought into the building. It was assembled in the building. No wall was built. Pardon me? A 30-foot wall was built inside the premises. It would have to be knocked down. Well, that's one of the issues at trial, Your Honor. The owner testified that the wall would not have to be knocked down because they would simply remove the- That's very true, but you have a trial judge listen to the testimony of both sides, weighed the evidence, made certain findings, and one of the findings was that the strained equipment could not be removed without material damage to the premises. And we're bound by the manifest weight standard here. I believe we are. I respectfully submit, Your Honor, that that finding was inconsistent with the evidence that was adduced at trial. The owner, not the bank, the owner testified that all of this equipment was welded together inside the building. It was brought in piece by piece. And he testified also that the welds could be broken and removed and the equipment could be taken out of the front door piece by piece without damaging the building. And it would be useless then. I'm sorry? It would be useless then. That's not necessarily- Scrap metal right in the record. Well, Your Honor, that was the testimony of the owner of the building, of Mr. Pulakeff, so it was not the testimony of the tenants represented. But isn't it the function of the trial judge to make credibility assessments, to determine the reasonableness, unreasonableness of the evidence, to make appropriate findings- Yes, I agree with that. Based upon the evidence? But when the evidence is clear, there's no dispute as to what the facts are. The facts are that this equipment was brought in piece by piece. It was welded together inside the building. It was put together in a structure that was used in connection with the tenant's business. And the only testimony regarding the removal was that the equipment could be taken apart and removed through the front doors. And the wall would have to be torn down and rafters would have to be affected because rafters were taken out when the machinery was brought in. So you're ignoring some of the evidence that was before Judge White. And there's a question as to the total integrity of the structure if the rafters are affected. So you're talking about a sizable amount of cash. Are you saying you still are willing to pay that $30,000, $50,000, $100,000? We acknowledge that if there's damage to the building, we would have to pay it. We acknowledge that in the trial court. That's not the question. The question is not damages. If we damage the building, we have to pay for it, just like any other tenant. But you'll be right back here because there will be an issue with damages. That may be, but I don't know that that's factual, Your Honor. Our representative, the representative of the tenant who put this property into the building, who used the building and used the equipment. No, he's the second tenant. Well, he was the one who used the equipment. Yeah, he didn't put it in. That's true. But he used the equipment. He was familiar with the manner in which it was put into the building. But he himself made statements that he could not definitely say what effect it would have on the rafters and the structural integrity of the building. He himself made those statements. Well, Your Honor, all I can say is that what he did testify was that this equipment could be, it was bolted to the rafters. You simply unscrew the bolts. When you look at the photographs of this equipment, this is all freestanding equipment that's bolted to the floor. It was bolted to the rafters. So why is Judge White wrong? I mean, he got manifest of the weight. Tell me why Judge White is wrong. Judge White is wrong because these are not realty fixtures. These are trade fixtures. These were fixtures that were placed in a building for a specific purpose, and that purpose was to be used in connection with this converters' extruded film business. The warehouse had another use before converters' extruded films moved in. So these are trade fixtures. And trade fixtures, as a matter of law, retain their identity as personality. Now, the factors to be considered by the court in connection with determining whether an item is a trade fixture are adaptation, annexation, and intent. The adaptation factor is used that the court has to determine whether the property in question was adapted to a specific type of business. In this case, I would respectfully submit that this film equipment can only be used by a film extruder. It has no other use. With regard to annexation, this equipment was not cemented. It's not bound to the floor by cement. It's bolted to the floor. That's a part. That's not all. I'm sorry? You're still not addressing rafters and other things such as that. Well, but I'm talking about the equipment itself, Your Honor. The equipment is a trade fixture. Correct, but if in order to get it out, other things are going to have to be removed, taken apart, damaged to the structure of the building, and if, in fact, these items are going to have to be welded and broken down, what value of all of this is it to the bank? Well, Your Honor, these are all separate pieces of equipment. It's like Legos. You put them together, and you take them apart. All of these machines were connected because they were a process, but they're all separate machines. When you look at the photographs that are part of the record, these are all freestanding machines that can be brought into the building or taken out of the building. When you use them as a process, they have to be connected. So you disconnect them, remove them from this building, you take them to another building, and you connect them in another building. But they can all be disconnected and reconnected through removing the bolts that are included in the equipment, and that was the testimony of the tenant's representative at trial. In the process, you spoke about materials being taken up, once tore up. Don't they go through rafters and pipe? Isn't there some pipe work? Well, Your Honor, the rafters were placed in the building in order to support the, as I understand, in order to support the tower. There's a tower structure where people could go up and actually stand on. And these extruders, they flowed down in an angular manner. So the tower had to be supported in some manner. So the rafters were put in the building so that they could bolt the tower to the rafters so that the equipment itself would be stable. Because obviously when you've got this kind of a process going on, you need to have it connected to the floor and the building in order for it to be secure. When it's non-operational, that's not necessary. And you can take these pieces of equipment, you can disconnect them, unbolt them from the floor, and remove them from the building in the same manner that they were put into the building. And that was what the testimony of the tenant's representative was. Were you going to address the lanes, the UCC versus the common law lane? We have a security interest that was created pursuant to a security agreement that was perfected by filing a UCC financing statement. Under the Uniform Commercial Code, the proper place of filing is the principal place of business of the tenant. Therefore, we filed in the State of Missouri. We did not do a fixture filing because the bank contemplated that its collateral would remain personality and therefore did not consider it necessary to file a fixture filing. I acknowledge that the bank did not file a fixture filing. That is not an issue in this case. The landlord has and claims a landlord's lien for non-payment of rent. The landlord is entitled to a lien on property that is so permanently attached to the real estate that it would be deemed to be a realty fixture. And that is what the real issue is here. Whether the extruding equipment constitutes a realty fixture and therefore is a permanent improvement of the real estate or whether it continues to be a trade fixture and would as a matter of law be considered to be personality. And the trial court specifically made a finding that the fixtures here were permanently attached to the premises and constituted trade fixtures. Yes, Your Honor. The trial court did make that finding. I respectfully submit that based upon the testimony at trial that finding was erroneous. I have nothing further unless the court has questions for me. No, thank you. Thank you. May it please the Court, Robert Wagner on behalf of the defendants. In this case, the bank didn't do a very good job in perfecting or protecting its security interest. In 2005, they loaned $1.1 million to this tenant. They took a UCC financing statement. That statement generically referred to part of the collateral being protected as fixtures. And under the UCC, that required a fixture filing. As counsel has conceded, there was no fixture filing. No fixture filing, there is no perfection of the UCC security interest. You're talking about in Cook County. In Cook County. They filed with the Secretary of State in Missouri for things that were not fixtures, but a UCC requires a fixture filing for things that are fixtures. So with respect to whether or not this is a trade fixture or some other kind of fixture, I think is really a red herring. Whether it's a trade fixture or not, it's still attached to the real estate. And the UCC still requires a fixture filing statement in the county where the real estate is located. In addition, when the bank made this loan, they knew they were loaning the money to a business that was a tenant in a building. They had to have notice of the lease. There was a lease provision, 9.1.12, that said all fixtures and equipment permanently attached to the property will remain property of the owner upon termination of the lease. So they knew that. And what banks typically do to protect themselves is enter into some sort of subordination agreement with the landlord, subordinating the landlord's interest in fixtures to that of the bank. And that was not done in this case. So essentially what happened was the bank lost priority of its UCC security interest. And it was conceded at trial that the owner, who had filed about two weeks before the trial, a distress warrant and complaint, had perfected its landlord's lien and had a lien that had priority over the bank's unperfected UCC lien. And basically that issue was conceded subject to the court, the trial court, finding whether or not something was a fixture. And both counsels stated to the court before the start of the trial, which, by the way, was tried on the return date. So the case was filed, I think, December 12th. We went to trial December 29th. Both counsel and the court were accommodating to one another. And the court asked us to stipulate to the exhibits, which we did. And we presented to the court a simple issue. If it is a fixture, then the landlord wins. If it's not a fixture, then the bank wins. We went to the trial. The trial court found that it was indeed a fixture. Now, for the court to make that determination, there's basically three factors that the trial court had to consider. Number one, the attachment to the real estate. Number two, the intent of the parties in attaching it to the real estate, whether they intended it to become part of the real estate or personal property, and whether or not its removal would cause damage to the real estate. At the trial, the defendant presented evidence in support of their position that it was a fixture on each and every one of these elements. The owner testified that the equipment was attached to the property, brought in piecemeal, rafters had to be removed, rafters had to be moved, the structural integrity of the building was compromised in order to accommodate the installation of these equipment, which reached from floor to ceiling, and the ceiling, I believe the testimony was, was two and a half to two stories above the ground. The equipment was bolted to the floor. There were significant, substantial attachments to the walls. There were tubes. There were conduit. A number of things that made that equipment a permanent part of the real estate. And with respect to the agreement of the parties, the C-extruded film in this case, they took an assignment to the lease. The lease had that 9.1.12 paragraph, and that would indicate that fixture and equipment permanently attached would remain property of the owner. So the court did consider that, did consider the lease and the agreement of the parties and the indication in that document that it was to remain. So that's where you get your intent. That's where you get the intent. And then you get, with respect to the damage to the real estate, I think Your Honors all recognize that a wall would have to be torn down, the rafters would have to be relocated or rebuilt. He's saying the wall may not have to be torn down, that the thing could be broken down into pieces. Well, that was, I don't believe the, well, let's put it this way. I believe the trial court resolved that issue in my client's favor. With respect to the evidence we presented, we had evidence on each and every one of these issues. Now, my client testified that wall had to be built or was built after the equipment was installed. I believe he testified that unless you wanted to scrap the equipment by torch, cut it into pieces and throw it out for scrap, I suppose then the wall wouldn't have to be removed. But with respect to taking it out in substantial pieces, that wall would have to come down and the roof would have to require some repairs. As far as the evidence presented before the trial court, the landlord, of course, was present when the improvements were made to the premises. He had the advantage of seeing the construction and what had to be modified, the rafters, the building of the wall. The other witness for the bank, of course, was kind of a Johnny come lately to the whole proceedings, as I understand. That's correct. And I believe what the trial court did was weigh the credibility of the witnesses there and made a determination that the landlord was more believable because of its superior knowledge. The landlord did have experience with this kind of equipment. It was similar to his business. So he was able to testify, I think, in a credible fashion about how the equipment was attached, what would be required to tear it down. And his testimony was corroborated by the photographs. On the other hand, Mr. Muntz, who testified for the bank, I don't think was hired until three years after the equipment was installed. He himself was the chief financial officer. He didn't really have any hands-on knowledge of how this equipment operated or how it was attached. And essentially, his understanding was not persuasive to the trial court. And it was contradicted by the photographs because Mr. Muntz testified you could unbolt this equipment from the floor and just cart it out. And from the photographs themselves, it was clear that much more would have been required to remove this equipment. Wasn't part of the equipment actually bolted in, sunk into the concrete and bolted into the concrete through bolts that were sunk? That's correct. There were bolts sunk into the concrete. There were photographs given to the court of the legs of the silos that were bolted into the floor with substantial nuts and bolts. And the owner testified that removing these bolts would leave large holes in the floor, again, substantially damaging his property. Unless Your Honors have any other questions, I think that it's clear that the judgment of the trial court has to be sustained. The decision was not against the manifest weight of the evidence and was supported by substantial evidence on all of the elements that the defendant had to prove or establish in order to support a finding of a fixture. Thank you. Your Honor, I only want to address the issue of the lease because the lease relates to the intent factor regarding whether an item is a fixture or a trade fixture. The lease itself was a boilerplate lease and there was a provision regarding fixtures, but it used the term fixture, not trade fixture. The lease did not include a description of the disputed property. It didn't include a description of any of the personal property of the tenant that was brought into the premises specifically. Now, the landlord indicated that he was present at the time that this property was brought into the premises. He negotiated this lease with the tenant. He testified at trial that the original intent was that this tenant would buy the building from him. But the landlord didn't include any provisions in the lease regarding the option to purchase the property and specifically didn't include any provisions in the lease regarding this property, excluding equipment or the tenant's improvements or specifically any trade fixtures. Well, assuming that it was boilerplate, it seems to me that it was broad enough relating to alterations, additions, fixtures, partitions, heating, ventilating, air conditioning, other equipment permanently affixed to the premises. So you get down to the same issue that was before the court in weighing the evidence, whether it was permanently attached to the property. That's one of the factors, yes. But if it's permanently attached to the property, the question is whether it was intended to become part of the real estate or whether it was intended to be a trade fixture which retains its character as personality, even if it's bolted to the floor. The courts have consistently held that. And in this case, although the equipment was bolted to the floor in order to retain its structural integrity while it was in operation, this was still used exclusively in connection with the business of this tenant and was collateral for the loan that was provided to the successor to this tenant and therefore retained its character as a trade fixture and was therefore personality. Are there any other questions? No, thank you. Thank you very much for your time. This matter will be taken under advisory.